UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

RCJV HOLDINGS, INC.,

                                 Plaintiff,

                -v-

COLLADO RYERSON, S.A. DE C.V.,
CORYER, S.A. DE C.V., and NATIXIS,

                          Defendants.

----------------------------------------------------------X

No. 11 Civ. 2854 (RA)

OPINION AND ORDER

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/8/14

RONNIE ABRAMS, United States District Judge:

       Plaintiff RCJV Holdings, Inc. ("RCJV") brings this breach of contract action against Collado Ryerson, S.A. de C.V. ("Collado"), and Coryer, S.A. de C.V. ("Coryer"), to recover $2,655,000 plus interest allegedly owed by Collado on a promissory note and by Coryer as guarantor of Collado's obligations under that note. Defendants claim that the promissory note does not permit them to pay RCJV until they have satisfied a debt to Intervenor-Defendant Natixis incurred under a credit facility agreement. Before the Court are the parties' cross-motions for summary judgment on RCJV's claims.

       For the following reasons, the parties' cross-motions for summary judgment with respect to Collado's liability are denied, but RCJV's motion for summary judgment is granted with respect to Coryer's liability.

## BACKGROUND

### A.   Factual Background[1]

#### 1.   The Joint Venture

RCJV is an affiliate of Ryerson, Inc. ("Ryerson"), and Coryer is an affiliate of Grupo

Collado, S.A. de C.V. ("Grupo"), a Mexican corporation.  (Full 56.1 ¶¶ 1-3.)  In 2003, Ryerson

and Grupo, through RCJV and Coryer, entered into a transnational joint venture to form Collado,

which fabricated and processed steel in Mexico for sale to the joint venturers' customers.  (Id. ¶¶

---

[1] The facts recited below are drawn from the parties' exhibits, as well as Plaintiff's Counter
Response to Defendant and Intervenor's Counter-Statement of Undisputed Material Facts
Pursuant to Local Civil Rule 56.1 ("Full 56.1") (Dkt. No. 92), which incorporates both parties'
Rule 56.1 submissions.  Where the Rule 56.1 statement is cited, Defendants do not dispute the
fact asserted, have offered no admissible evidence to refute the fact, or merely object to
inferences drawn from the fact.

RCJV faults Defendants for failing to file an affirmative Rule 56.1 statement in addition to their
counterstatement, and it asks the Court to deny their motion on that basis.  The Court declines to
do so.  "A district court has broad discretion to determine whether to overlook a party's failure to
comply with local court rules," including Rule 56.1.  Holtz v. Rockefeller & Co., Inc., 258 F.3d
62, 73 (2d Cir. 2001), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S.
167 (2009); see also Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 155 n.2 (2d Cir.
2003); Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis, No. 07 Civ. 7343 (HB), 2008 WL
4580016, at *7 (S.D.N.Y. Oct. 14, 2008).  RCJV does not argue that it was prejudiced by
Defendants' failure to file an affirmative statement.  Furthermore, Defendants make little use of
extrinsic evidence, choosing instead to rely on the language of the relevant agreements, which
Defendants included as exhibits to their motion.  Requiring a separate Rule 56.1 statement and
counterstatement concerning these agreements would force the parties to rehash arguments from
their other submissions, violating the spirit of the rule.  See Amerol Corp. v. Am. Chemie-
Pharma, Inc., No. 04 Civ. 0940 (JO), 2006 WL 721319, at *9 (E.D.N.Y. Mar. 17, 2006)
(emphasizing that Rule 56.1 was "designed to promote, rather than frustrate, decisions on the
merits").  Moreover, RCJV's submissions are not models of compliance with the Rules.  (See
Full 56.1 at pp. 1-4; infra notes 12, 14, 17.)

3-4.) Ryerson owned 49.99% of Collado through RCJV, while Grupo owned the majority of Collado through Coryer.  (Id. ¶ 5.)

### 2. Financing the Joint Venture

On August 19, 2004, Collado entered into an Uncommitted Credit Facility Letter Agreement with Natixis.  (Id. ¶ 8.)  Under this original Credit Facility, Natixis made revolving credit loans of up to $10,000,000 available to Collado for a specified period of time ending on May 31, 2005.  (Id. ¶¶ 10, 12.)  Although Natixis was permitted to revoke the Credit Facility at any time, it was also permitted to extend the termination date by amendment, as it did three times between 2005 and 2007.  (Id. ¶¶ 9, 12, 18-20.)

On October 1, 2008, Collado and Natixis amended the Credit Facility a fourth time (the "October 1, 2008 Amendment"), extending the termination date to December 29, 2008.  (Id. ¶ 21.)  This Amendment also added a covenant (the "October 1, 2008 Covenant") that prohibited Collado from "pay[ing] any indebtedness, accounts payable, or other amount due by [Collado] to either [Grupo] or Ryerson Inc., or any of their respective affiliates or subsidiaries until the Loans and all other amounts due and owing under the [Credit Facility] ha[d] been paid and satisfied in their entirety."  (Id. ¶ 22; Def. Ex. C at COLLADO_000205.)  The Credit Facility states that the breach of any covenant constitutes an "Event of Default."  (Def. Ex. B at COLLADO_003999-4000.)

### 3. Termination of the Joint Venture

In the spring of 2008, Ryerson advised that it wanted to liquidate the joint venture, citing the two sides' inability to agree on operations or strategy.  (Full 56.1 ¶¶ 24, 26-27.)  Grupo expressed interest in buying Collado, rather than liquidating it or selling it to a third party.  (Id. ¶ 24.)  Natixis, however, was reluctant to continue its participation, as Collado's debt under the

3

Credit Facility would need to be treated as a Mexican loan if Ryerson exited the joint venture. (Id. ¶ 28.)  Consequently, Grupo committed to pay Natixis $3,000,000 in cash, Natixis was involved in the buyout negotiations, and the final agreement was subject to Natixis's approval. (Id. ¶¶ 30, 33.)

Collado, Grupo (through Coryer), Ryerson (through RCJV), and Natixis consummated their transaction on November 28, 2008.  (Id. ¶¶ 35, 38.)  Ryerson and Collado entered into a termination agreement that concluded Ryerson's investment in Collado.  (Id. ¶ 39.)  Ryerson also sold its interest in Collado to Grupo for $2,655,000 in the form of a promissory note (the "Note") from Collado in favor of RCJV.  (Id. ¶¶ 34-36, 74, 100; Def. Ex. A at Ex. A.[2]).  In addition, Coryer executed a guaranty (the "Guaranty") of Collado's obligations under the Note in favor of RCJV.  (Full 56.1 ¶¶ 106-07; Def. Ex. A at Ex. A, 5.)  Natixis approved the termination agreement and Note and received its $3,000,000 payment.  (Full 56.1 ¶¶ 43-44, 72.)

Collado and Natixis also executed an additional amendment to the Credit Facility (the "November 28, 2008 Amendment") reflecting Natixis's approval and payment.  (Id. ¶¶ 47, 64; Pl. Ex. 10 at COLLADO_2268, 2270-72.)  This Amendment purported to be a "final extension of the [Credit Facility]" to December 28, 2009, "in order to afford [Collado] the opportunity to find a replacement lender."  (Pl. Ex. 10 at COLLADO_002268.)  The Amendment also modified the October 1, 2008 Covenant in order to permit the payment of transitional employee expenses and net trade payables to Ryerson.  (Id. at COLLADO_002269; Full 56.1 ¶¶ 64-65.)

The Note states that Collado promises to pay RCJV the principal amount of $2,655,000 plus interest on April 15, 2011.  (Def. Ex. A at Ex. A, 1.)  After various paragraphs explaining

---

[2] This citation refers to the document entitled "Promissory Note," which is Exhibit A to the document that Defendants have submitted as Exhibit A to their motion.

the parties' rights and obligations, the Note contains a subordination provision (the

"Subordination Provision"):[3]

- [Collado] covenants and agrees that notwithstanding anything to the contrary herein, but subject to the terms of the next sentence, this Note and the obligations hereunder (the "Subordinated Debt") are subordinated in right of payment to all obligations of [Collado] to Natixis (f/k/a Natexis Banques Populaires), New York Branch (the "Bank") under that certain Uncommitted Credit Facility Letter Agreement dated as of August 19, 2004 between the Bank and [Collado] (as amended from time to time, the "Natixis Credit Facility"), now existing or hereafter arising (the "Senior Debt"); provided, that the aggregate principal amount of the Senior Debt shall not exceed $11,400,404.00.

- Notwithstanding the foregoing, [Collado] shall be permitted to make (and [RCJV] shall be permitted to retain) any payment to [RCJV] under the terms of this Note for all or any part of the Subordinated Debt; provided, however,

    (i) that no such payment may be made until such time as the Subordinated Debt becomes due and owing hereunder;

    (ii) at the time of such payment, no default or event of default shall have occurred and be continuing under the Natixis Credit Facility (provided, however, if the Bank shall have voluntarily extended the maturity of the Natixis Credit Facility beyond the Due Date, [Collado] shall be permitted to make (and [RCJV] shall be permitted to retain) any payment hereunder if at the time of such payment, no default or event of default shall have occurred and be continuing as a result of [Collado's] failure to pay any amount owing to the Bank under the Natixis Credit Facility); and

    (iii) the making of such payment would not create or cause a default or event of default to occur under the Natixis Credit Facility (it being understood that this clause (iii) shall not apply to any covenant added to the Natixis Credit Facility after the date hereof expressly prohibiting payment of this Note).

- If any default or event of default shall exist under the Natixis Credit Facility, any payment due hereunder not made during the existence of such default shall be paid forthwith upon any cure or waiver of such default.

- Notwithstanding anything to the contrary herein, the terms contained in this paragraph shall not apply if all or any part of the Natixis Credit Facility is

---

[3] Although the Subordination Provision appears in the Note as a single paragraph, it is reproduced here in bullet form for the sake of clarity.

assigned by the Bank to any other lender or if any portion of the Natixis Credit
Facility shall be replaced by any successor credit facility.

(Id. at Ex. A, 2.)

Immediately after the Subordination Provision, the Note contains the following provision

(the "Event of Default Provision"):

> Each of the following shall constitute an event of default under this Note
> (each, an "Event of Default"):
>
> (a) [Collado] fails to pay the entire Principal Amount, together with all accrued
>     and unpaid interest thereon, on the Due Date (whether or not [Collado] is
>     permitted to make such payment under the terms of the immediately
>     preceding paragraph [i.e., the Subordination Provision]); . . . .
>
> If [an] Event of Default occurs and is continuing, then, upon written notice by
> [RCJV] to [Collado], the entire outstanding portion of the Principal Amount and
> all accrued and unpaid interest hereunder and all other unpaid amounts and
> obligations due by [Collado] hereunder shall become immediately due and
> payable without protest, demand, presentment, or further notice of any kind.

(Id. at Ex. A, 2-3.)

On the last page of the Note, after the signatures of Collado's counsel, appears the

Guaranty signed by Coryer's counsel:

> [Coryer] hereby irrevocably and unconditionally guaranties the full and
> complete payment and performance of all of [Collado's] obligations under this
> Note, as and when due, whether for the payment of money, the performance of
> obligations, or otherwise as more specifically set forth in this Note. It shall not be
> necessary for [RCJV] to exhaust its remedies against [Collado] prior to asserting
> its remedies against Coryer under this Guaranty. This Guaranty is a guaranty of
> performance and payment, and not of collection only. Coryer waives all defenses
> with respect to this Guaranty based upon suretyship or impairment of collateral.

(Id. at Ex. A, 5.)

### 4. Subsequent Events

On January 26, 2010, Collado and Natixis executed an "Amended and Restated Facility

Agreement" (the "January 26, 2010 Agreement"). This Agreement claims to "amend and restate

in its entirety" the "Original Agreement," which it defines as the Credit Facility "as amended

6

from time to time." (Pl. Ex. 19 at Ex. D, 1.)  Among other things, the January 26, 2010

Agreement decreased the loan amount, modified the interest rate, and charged Collado a

"Restructuring Fee" of $218,008.08.  (Id. at Ex. D, 6-7.)  It also amended the October 1, 2008

Covenant to allow Collado to pay certain accounts payable to Grupo.  (Id. at Ex. D, 13.)

　　　　After the April 15, 2011 due date had passed, RCJV demanded compliance with the Note

and Guaranty.  (Full 56.1 ¶ 136.)  Neither Collado nor Coryer has paid RCJV any of the money it

demands.  (Id. ¶ 137.)  This suit followed.

## B.　　Procedural History

　　　　RCJV filed this action on April 27, 2011 against Collado and Coryer for breach of the

Note and Guaranty, respectively.  Defendants answered the complaint on August 15, 2011.  The

Honorable Colleen McMahon, to whom this case was previously assigned, granted Natixis's

motion to intervene on February 14, 2012.  The case was reassigned to this Court on July 10,

2012, and the parties subsequently filed the summary judgment motions before this Court.

## STANDARD OF REVIEW

　　　　Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  This is because trial is unwarranted where "'the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party.'"  Bouzo v. Citibank, N.A., 96 F.3d 51, 56

(2d Cir. 1996) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986)).  The Court must "constru[e] all the evidence in the light most favorable to the non-

movant and draw[] all reasonable inferences in that party's favor."  Rivera v. Rochester Genesee

Reg'l Transp. Auth., 743 F.3d 11, 19 (2d Cir. 2014) (quoting McBride v. BIC Consumer Prods.

Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009)).

7

"Because this is a diversity case," the Court applies "state substantive law" and "federal procedural law." In re Fosamax Products Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013), cert. denied 133 S. Ct. 2783 (2013). "The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).[4]

Under New York law, the "unambiguous provisions" of a contract "must be given their plain and ordinary meaning," and their interpretation "is a question of law for the court." White v. Cont'l Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007). If, however, "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way," the contract is ambiguous. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). "The question whether a writing is ambiguous is one of law to be resolved by the courts." Wallace v. 600 Partners Co., 658 N.E.2d 715, 717 (N.Y. 1995) (citation omitted).

"Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous . . . ." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002). If there is no relevant extrinsic evidence, the Court must resolve the ambiguity as a matter of law. See Hartford Acc. & Indem. Co. v. Wesolowski, 305 N.E.2d 907, 909 (N.Y. 1973). The same is true "if the evidence presented about the parties' intended meaning [is] so one-sided that no

---

[4] The Note specifies that it "has been executed in and shall be governed by and construed in accordance with the laws of New York." (Def. Ex. A at Ex. A, 4.) "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000). There is no indication of fraud or any violation of public policy, and the Note concerns the "New York Branch" of Natixis. (Def. Ex. A at Ex. A, 2.) The Court need not further address the question of whether there are sufficient contacts to New York, as the parties assume the applicability of New York law.

reasonable person could decide the contrary." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted). But "when a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc., 489 N.E.2d 729, 732 (N.Y. 1985) (citation omitted).

Accordingly, summary judgment is appropriate here if "the contractual language is unambiguously in conformity with one side's interpretation," Giles v. City of New York, 41 F. Supp. 2d 308, 315-16 (S.D.N.Y. 1999), or if the contractual language is ambiguous but "the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law," Shepley v. New Coleman Holdings Inc., 174 F.3d 65, 72 n.5 (2d Cir. 1999) (internal quotation marks omitted).

## DISCUSSION

It is undisputed that, as the due date for Collado's debt to RCJV was April 15, 2011, the Note has reached maturity and is now due and owing. (Full 56.1 ¶ 84; Def. Mem. 8.) It is also undisputed that neither Collado nor Coryer has paid RCJV any of the money RCJV demands under the Note and Guaranty. (Full 56.1 ¶¶ 136-37.) Defendants argue, however, that the Note's Subordination Provision prohibits Collado from paying RCJV before Collado has satisfied its debt to Natixis under the Credit Facility. They further argue that, as the Guaranty obligates Coryer to pay RCJV only when Collado is so obligated, collection cannot be made against Coryer either. RCJV contests Defendants' interpretation of the Subordination Provision and argues that it is overridden by another provision in the Note that identifies events of default.

9

**A.     The Subordination Provision**

The Note provides that "notwithstanding anything to the contrary herein, but subject to the terms of the next sentence, this Note and the obligations hereunder (the 'Subordinated Debt') are subordinated in right of payment to all obligations of [Collado] to Natixis" under the Natixis Credit Facility "as amended from time to time."   (Def. Ex. A at Ex. A, 2.)   The "next sentence" explains that "[n]otwithstanding the foregoing, [Collado] shall be permitted to make (and [RCJV] shall be permitted to retain) any payment to [RCJV] under the terms of this Note for all or any part of the Subordinated Debt," provided that three conditions are met.   (Id.)

First, "(i) . . . no such payment may be made until such time as the Subordinated Debt becomes due and owing hereunder."   (Id.)   As Defendants concede, the Subordinated Debt became due and owing on April 15, 2011.   (Id. at Ex. A, 1; Full 56.1 ¶ 84; Def. Mem. 8.)

Second, "(ii) . . . no default or event of default shall have occurred and be continuing under the Natixis Credit Facility," with certain exceptions.   (Def. Ex. A at Ex. A, 2.)   Defendants concede that this condition is met as well.   (Def. Mem. 8.)

The third condition is that "(iii) the making of such payment would not create or cause a default or event of default to occur under the Natixis Credit Facility (it being understood that this clause (iii) shall not apply to any covenant added to the Natixis Credit Facility after the date hereof expressly prohibiting payment of this Note)."   (Def. Ex. A at Ex. A, 2.)   Defendants argue that this condition is not satisfied because paying RCJV ahead of Natixis would cause a default under the Natixis Credit Facility.   RCJV maintains that this default does not bar payment, as it falls under the parenthetical exception (the "Parenthetical Exception") for the violation of a covenant added "after the date hereof expressly prohibiting payment of th[e] Note."

10

RCJV further argues that, even if condition (iii) for payment of the subordinated debt is not satisfied, Collado's debt under the Note is no longer subordinated. The Note states in the same paragraph that, "[n]otwithstanding anything to the contrary herein, the terms contained in this paragraph shall not apply if all or any part of the Natixis Credit Facility is assigned by [Natixis] to any other lender or if any portion of the Natixis Credit Facility shall be replaced by any successor credit facility." (Id.) RCJV contends that the Credit Facility was replaced by a successor credit facility in 2010.

The Court addresses these two arguments in turn.

### 1. Default Under the Natixis Credit Facility

Collado could not pay RCJV on or after the due date for the Note without defaulting on the Natixis Credit Facility. The Note defines the "Natixis Credit Facility" as the original credit facility agreement "*as amended* from time to time." (Id. (emphasis added).) Under the Credit Facility, the breach of any covenant constitutes an "Event of Default." (Def. Ex. B at COLLADO_003999-4000.)

The October 1, 2008 Amendment to the Credit Facility introduced a new section providing that Collado covenants "not [to] pay any indebtedness, accounts payable, or other amount due by [Collado] to either [Grupo] or Ryerson Inc., or any of their respective affiliates or subsidiaries [(including RCJV)] until the Loans and all other amounts due and owing under the [Credit Facility] have been paid and satisfied in their entirety." (Def. Ex. C at COLLADO_000205.)

This October 1, 2008 Covenant was modified slightly in the November 28, 2008 Amendment to allow Collado to pay Ryerson in connection with certain trade payables and employee expenses. (Pl. Ex. 10 at COLLADO_002269.) The January 26, 2010 Amended and

11

Restated Facility Agreement retained the Covenant with an exception allowing Collado to pay certain accounts payable to Grupo. (Pl. Ex. 19 at Ex. D, 13.) Despite these changes, it remained a breach of the Credit Facility after October 1, 2008 for Collado to pay the Note before satisfying its debt to Natixis.

For this reason, Defendants argue that Collado's payment of the Note would run afoul of condition (iii) of the Subordination Provision and consequently is not "permitted" under the terms of the Note.[5] (Def. Ex. A at Ex. A, 2.) RCJV argues, however, that the October 1, 2008 Covenant falls under the Parenthetical Exception to condition (iii) and that, therefore, the Note permits Collado to breach the Covenant by paying RCJV. The Court finds that there is a genuine dispute as to whether the Parenthetical Exception covers the October 1, 2008 Covenant.

**Text and Structure**

Collado's interpretation finds support in the literal text of the Parenthetical Exception. The exception is limited to covenants "added to the Natixis Credit Facility after the date hereof." (Def. Ex. A at Ex. A, 2.) "The word 'hereof' when used in a document patently refers to the document in which the term is used." Kleila v. Kleila, 406 N.E.2d 753, 757 (N.Y. 1980); see also Capital Ventures Int'l v. Verenium Corp., No. 09 Civ. 4261 (GBD), 2011 WL 70227, at *5 (S.D.N.Y. Jan. 4, 2011); Stroll v. Epstein, 818 F. Supp. 640, 645 (S.D.N.Y. 1993), aff'd 9 F.3d 1537 (2d Cir. 1993). As this clause appears in the Note, "the date hereof" is presumptively the date of the Note: November 28, 2008. The October 1, 2008 Covenant was added nearly two

---

[5] Contrary to RCJV's assertion, it is immaterial that the Note does not "expressly incorporate" the October 1, 2008 Covenant. A breach of any covenant in the Credit Facility not covered by the Parenthetical Exception violates condition (iii) of the Note's Subordination Provision, preventing payment to RCJV.

months before the date of the Note and therefore would not appear to fall within the Parenthetical Exception.

RCJV argues that "the date hereof" refers to the original Credit Facility, which is dated August 19, 2004. If the parties had wanted this portion of the Note to refer to the date of the Credit Facility, however, they could have chosen the word "thereof" rather than the self-referential word "hereof." Indeed, they used the word "thereof" elsewhere in the Note. (See Def. Ex. A at Ex. A, 1 (describing the accrual of interest "for each calendar month (or portion *thereof*)"), 3 (discussing events "which result[] in the acceleration of any such *other* indebtedness or which permit[] the holder or holders *thereof* . . . to accelerate [its] maturity") (emphasis added).) Moreover, the parties could have accomplished the same result by drafting the Parenthetical Exception in broad terms (*e.g.*, "this clause (iii) shall not apply to any covenant . . . expressly prohibiting payment of this Note"). Under RCJV's interpretation, the parties' decision to specify a date would be superfluous.

In support of its argument, RCJV quotes the following paragraph from the October 1, 2008 and November 28, 2008 Amendments to the Credit Facility:

> On or after the Effective Date, this Amendment shall be part of the Agreement,[6] all references to the Agreement in the Agreement and the other related documents shall be deemed to refer to the Agreement as amended by this Amendment, and the term "this Agreement", and the words "hereof", "herein", "hereunder" and words of similar import, as used in the Agreement, shall mean the Agreement as amended hereby. This Amendment shall be deemed a Credit Document under the Agreement.

---

[6] The Amendments define the "Agreement" as the amended Credit Facility. (Def. Ex. C at COLLADO_000204; Pl. Ex. 10 at COLLADO_002268.)

(Def. Ex. C at COLLADO_000206; Pl. Ex. 10 at COLLADO_002271.) RCJV interprets this paragraph to mean that the word "hereof" in the Note refers to the original, unamended Credit Facility dated August 19, 2004.

This is plainly wrong. The paragraph defines the word "'hereof' . . . *as used in the [Credit Facility]*," not as the word is used in the Note. (Id. (emphasis added).) It is unsurprising that an amendment to the Credit Facility would use the word "hereof" to refer to that Credit Facility; it does not follow that a separate promissory note between different parties would use the word "hereof" in the same fashion. Indeed, in another portion of the Note, the parties unmistakably use "hereof" to refer to the Note itself: "If any provision *hereof* results in an effective rate of interest exceeding the maximum rate of interest allowed under any applicable usury law, all sums in excess . . . shall be applied by [RCJV] to the outstanding portion of the Principal Amount, without premium or penalty." (Def. Ex. A at Ex. A, 4 (emphasis added).)

RCJV's argument would also require the Court to interpret the words "herein" and "hereunder" in the Note to refer to the Credit Facility, which is nonsensical. This becomes apparent upon reading the first full sentence of the Note: "*This promissory note* . . . is issued . . . for the benefit of RCJV Holdings, Inc. (*herein*, together with its successors and assigns, the 'Lender')." (Def. Ex. A at Ex. A, 1 (emphasis modified).) The fourth paragraph contains an equally telling example: "In the event *this Note*, including the entire Principal Amount and interest due *hereunder*, is not repaid in full on the Due Date . . . , interest on any unpaid amount . . . shall continue to accrue . . . ." (Id. (emphasis added).)[7]

---

[7] The Court also notes that the paragraph to which RCJV refers expressly states that the word "'hereof' . . . shall mean the Agreement *as amended hereby*" and that "all references to the Agreement . . . shall be deemed to refer to the Agreement *as amended by this Amendment*." (Def. Ex. C at COLLADO_000206; Pl. Ex. 10 at COLLADO_002271 (emphasis added).) Thus,

Notwithstanding this textual evidence in favor of Collado, an alternative reading of the Parenthetical Exception is possible. The word "'[h]ereof' is defined as 'of this' or 'of this thing.'" Capital Ventures Int'l, 2011 WL 70227, at *5 (quoting Black's Law Dictionary 795 (9th ed. 2009)). While "the date hereof" normally means "the date of the document that contains this sentence," it is not inconceivable that the parties intended to refer to the date of the document previously mentioned in that sentence, namely, the Credit Facility. Although the Note recognizes that the Credit Facility has been "amended from time to time," it states that the Credit Facility was "dated as of August 19, 2004." (Def. Ex. A at Ex. A, 2.) Thus, under this interpretation, the October 1, 2008 Covenant would post-date "the date hereof" and would fall within the Parenthetical Exception.

Because contract interpretation is an exercise in "common sense" rather than "formalistic literalism," "words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Duane Reade, Inc. v. Cardtronics, LP, 863 N.Y.S.2d 14, 19 (1st Dep't 2008) (internal quotation marks omitted). Here, there is reason to believe that the parties used the word "hereof" in the imprecise manner described above: the Parenthetical Exception serves no obvious purpose if it covers only those prohibitive covenants added to the Credit Facility after the date of the Note. If the October 1, 2008 Covenant were to prohibit Collado from paying the Note before it satisfies its debt to Natixis, there would be no reason to add another such covenant after the date of the Note. The

---

even if this definition of "hereof" applied to the Note, "the date hereof" would refer to the date of the *amended* Credit Facility. The Court need not, however, determine what date this would be, and it need not further address RCJV's related arguments premised on the distinction between "Credit Documents" and the Credit Facility "Agreement." (Pl. Reply 13-14; Full 56.1 ¶ 73 Counter-Response.) The definition of the word "hereof" in the Amendments to the Credit Facility unequivocally applies only to the Credit Facility and not the Note.

Parenthetical Exception would serve a purpose only if Natixis were to remove the October 1,

2008 Covenant from the Credit Facility, think better of it, and subsequently introduce a new

covenant expressly prohibiting payment of the Note. It is doubtful that the parties had this

scenario in mind, and "[a] contract should not be interpreted to produce a result that is absurd,

commercially unreasonable or contrary to the reasonable expectations of the parties." In re

Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (citations omitted).

More generally, there is language in the Subordination Provision that calls into question

Defendants' claim that Collado is not permitted to pay the Note prior to paying Natixis in full.

Two of the conditions for payment of the subordinated debt presuppose that Collado may pay

RCJV before paying Natixis. The parenthetical in clause (ii) identifies conditions under which

Collado may pay RCJV if Natixis "voluntarily extend[s] the maturity of the Natixis Credit

Facility beyond the Due Date." (Def. Ex. A at Ex. A, 2.) Similarly, under Defendants'

interpretation, the Parenthetical Exception in clause (iii) permits payment in a situation in which

the Credit Facility remains in effect but has been amended to include a covenant "expressly

prohibiting payment of th[e] Note." (Id.) So long as the October 1, 2008 Covenant remains in

effect, however, Collado is not permitted to make the payment that these conditions presuppose,

rendering these conditions meaningless.

Thus, two possibilities present themselves. One possibility is that the parties drafted

these conditions for payment of the subordinated debt anticipating that Natixis might decide to

remove the October 1, 2008 Covenant from the Credit Facility after the date of the Note. The

other possibility is that the parties drafted these payment conditions assuming that the October 1,

2008 Covenant would not bar payment, as it would be "carved out" by the Parenthetical

16

Exception. While the former is more faithful to the plain text of the Parenthetical Exception, the latter is more commercially reasonable.

Under these circumstances, the Court concludes that the Parenthetical Exception is ambiguous. Contract language is unambiguous only "where the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (alteration in original) (quoting Hunt Ltd. v. Lifschultz Fast Freight, 889 F.2d 1274, 1277 (2d Cir. 1989)). Thus, there is ambiguity if "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Topps Co., 526 F.3d at 68. Here, the parties' competing interpretations of the Parenthetical Exception are both flawed, and a reasonable person could choose either one. The Court must therefore look to extrinsic evidence of the parties' intent. See Greenfield, 780 N.E.2d at 170.

**Extrinsic Evidence**

The extrinsic evidence creates a genuine issue of material fact as to the meaning of the Parenthetical Exception.[8] On November 13, 2008, Ryerson executive Terence Rogers emailed Grupo executive Bernardo Vogel to discuss Natixis's failure to delete the October 1, 2008 Covenant in its draft version of the document that would become the November 28, 2008 Amendment to the Credit Facility. (Pl. Ex. 6 at COLLADO_000993.) In response to Rogers's statement that "[t]his is a show stopper," Vogel wrote that it was "probably an oversight on [Natixis's] part." (Id.) Read in isolation, this exchange suggests that the parties intended to

---

[8] The Court has reviewed the deposition testimony cited by the parties but does not discuss it here, as it merely restates arguments that can be made from the documents themselves.

17

remove the October 1, 2008 Covenant in its entirety. Vogel's email to Rogers the following day, however, proposed qualifying the flat prohibition on payments to Ryerson with a proviso allowing the payment of trade payables. (Pl. Ex. 7 at RC000012-13.)  Rogers wrote to Vogel that he would "make the language tighter by amending [the Covenant] to exclude [R]yerson in its entirety" (Pl. Ex. 9 at COLLADO_001154), but this proposal clearly was not implemented. The final November 28, 2008 Amendment included Vogel's proviso but did not otherwise modify the Covenant to allow payment of the Note. (Pl. Ex. 10 at COLLADO_002269.)  Thus, Rogers's primary concern may have been that the October 1, 2008 Covenant would prevent the payment of trade payables—not that it would perpetually subordinate the Note.[9]

On November 25, 2008, a few days after these exchanges between Rogers and Vogel, counsel for Natixis emailed Matthew Bradford, an associate director at Natixis, to report that Ryerson's counsel had requested certain changes to the Note. (Pl. Ex. 34 at NATIXIS00002286-87.) The email explained that Ryerson's counsel "want[ed] to limit the situation under which the subordination clause kicks in if the other conditions to payment have been met" and had proposed a variety of modifications that would satisfy Ryerson. (Id. at NATIXIS00002287.) Bradford forwarded the email to a director at Natixis, explaining that Natixis's counsel "[wa]s working on new wording . . . to allow for Ryerson's debt to remain subordinated past its sub debt due date in 2011 only if a payment default exists on our debt (this assumes we extend our facility past the due date of Ryerson's debt in 2011)." (Id. at NATIXIS00002286.) Although language specific to payment defaults was included in condition (ii) of the final Subordination Provision,

---

[9] Over the next few days, Rogers wrote to Vogel that there was "no need for formal subordination" because the Note would mature after the Credit Facility and because Natixis was "secured and over collateralized." (Pl. Ex. 13 at COLLADO_001436; Pl. Ex. 14 at RC003429.) The final Note did, of course, contain a formal subordination arrangement.

18

condition (iii) assumes that *covenant* defaults would prevent payment to RCJV as well—indeed, that is why the Parenthetical Exception carves out certain types of covenant defaults. (Def. Ex. A at Ex. A, 2.) Thus, while these emails tend to support the notion that the parties did not intend for the October 1, 2008 Covenant to bar payment of the Note, the fact that the specific proposal outlined in the emails was not implemented in the final Note leaves open the possibility that the parties changed their minds prior to execution.

The final relevant email exchange occurred on November 26, 2008. (Pl. Ex. 17 at RC000076.) Counsel for Ryerson emailed to Bradford, Rogers, and counsel for Natixis a draft of the Note that included the Parenthetical Exception as it appeared in the final version. Counsel for Natixis responded that Natixis "c[ould] not accept the change which freezes the covenants/defaults under the [Credit Facility] as of the date of this [N]ote." In reply, counsel for Ryerson explained that

> The change to which you refer does not freeze all covenants/defaults under the [Credit Facility] as of the date of the Promissory Note. It simply carves out a very narrow cross-section of covenants: namely, any covenant that expressly prohibits payment of our particular Promissory Note. Failure to include this carve-out would enable Natixis to unilaterally eviscerate the subordination provisions that we have otherwise agreed upon.

(Id.) Counsel for Natixis wrote back to say that he "spoke further to Natixis and they are ok with the changes to the Note." (Pl. Ex. 37 at NATIXIS00000660.)

Counsel for Natixis understood the phrase "the date hereof" in the Parenthetical Exception to mean the date of the Note, rather than the date of the Credit Facility. While counsel for Ryerson clarified the substantive scope of the exception, it is unclear whether he was

addressing the temporal scope of the exception as well.[10]  Notably, he did not mention the

October 1, 2008 Covenant even though, according to RCJV, that Covenant would have been his

primary concern.  It is further unclear whether the October 1, 2008 Covenant, which generally

prohibits payment of "any indebtedness" due to Grupo, Ryerson, or their affiliates and

subsidiaries, (Def. Ex. C at COLLADO_000205), "*expressly* prohibits payment of [the parties']

*particular* Promissory Note," (Pl. Ex. 17 at RC000076 (emphasis added)).

To be sure, counsel's stated concern that Natixis might "unilaterally eviscerate the

[S]ubordination [P]rovision[]" supports RCJV's interpretation of the Parenthetical Exception.

Nevertheless, given the competing inferences that could be drawn regarding the coverage of that

provision, the Court concludes that a reasonable jury could find for either side.[11]  Summary

judgment is therefore not warranted based on this provision of the Note.

---

[10] The meaning of his first sentence depends on where the emphasis is placed.  Compare the
following two versions:  (1) "The change to which you refer does not freeze *all*
covenants/defaults under the [Credit Facility] as of the date of the Promissory Note."  (2) "The
change to which you refer does not freeze all covenants/defaults under the [Credit Facility] as of
the date of the *Promissory Note*."  The next sentence in the email addresses the substance of the
covenants rather than when they were added to the Credit Facility, which favors the first
interpretation.  But that sentence also states that the Parenthetical Exception carves out "any"
covenant expressly prohibiting payment of the Note, which renders the second interpretation
possible.

[11] Defendants suggest that because counsel for Ryerson drafted the Parenthetical Exception, (Pl.
Ex. 17 at RC000076, 82; Pl. Ex. 65 at 80:12-15), any ambiguity must be construed against RCJV
under the doctrine of *contra proferentem*.  However, "[u]nder New York law," a situation in
which "the extrinsic evidence offered raises a question of credibility or presents a choice among
reasonable inferences . . . . requires a submission to the factfinder."  Alfin, Inc. v. Pac. Ins. Co.,
735 F. Supp. 115, 119 (S.D.N.Y. 1990); see also Morgan Stanley Grp. Inc. v. New England Ins.
Co., 225 F.3d 270, 279 (2d Cir. 2000) (approving the statement that "where the relevant extrinsic
evidence offered 'raises a question of credibility or presents a choice among reasonable
inferences' the construction of the ambiguous terms of the contract is a question of fact which
precludes the application of the contra proferentem rule"); cf. I.V. Servs. of Am., Inc. v. Trustees

## 2.  The Existence of a Successor Credit Facility

RCJV also argues that the Natixis Credit Facility was "replaced" by a "successor credit facility," triggering the final sentence of the Subordination Provision and rendering the entire provision inapplicable. (Def. Ex. A at Ex. A, 2.) According to RCJV, the January 26, 2010 Amended and Restated Facility Agreement qualifies as a successor credit facility that replaced the Natixis Credit Facility. This argument fails, as no reasonable juror would agree with RCJV.

The parties appear to agree that a "successor" agreement would have to do more than simply amend the Natixis Credit Facility. (Def. Mem. 11; Pl. Reply 15.) Indeed, the Note acknowledges that the Credit Facility has been "amended from time to time," but it does not provide that any further "amendment" will void the Subordination Provision. (Def. Ex. A at Ex. A, 2.) In addition, the Note contemplates that Natixis may "voluntarily extend[] the maturity" of the Credit Facility and that there may be "covenant[s] added to the Natixis Credit Facility." (Id.) If these events sufficed to trigger the final sentence of the Subordination Provision, the clauses that purport to attach other consequences to those events would serve no purpose whatsoever. New York law disfavors "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks omitted). Accordingly, to constitute a successor credit facility, the January 26, 2010 Agreement must amount to more than a mere amendment to the Natixis Credit Facility.

---

of Am. Consulting Eng'rs Council Ins. Trust Fund, 136 F.3d 114, 121 & n.8 (2d Cir. 1998) (noting that a "finder of fact" may consider the fact that contractual terms were drafted by one of the parties). Indeed, if the doctrine applied whenever contractual language and extrinsic evidence failed to resolve an ambiguity, virtually every case that turned on the interpretation of a contract would be decided on summary judgment.

The January 26, 2010 Agreement claims only to "amend and restate in its entirety the Original [Natixis Credit Facility] Agreement." (Pl. Ex. 19 at Ex. D, 1.) RCJV emphasizes, however, that this Agreement had a different loan amount and interest rate. But the October 1, 2008 Amendment modified the loan amount and interest rate as well, (Def. Ex. C at COLLADO_000204-05), and the November 28, 2008 Amendment modified the loan amount, (Pl. Ex. 10 at COLLADO_002269). Moreover, the January 26, 2010 Agreement extended no new money to Collado; instead, it decreased the loan amount, as did the October 1, 2008 and November 28, 2008 Amendments.

RCJV also notes that, while the January 26, 2010 Agreement contains the Covenant prohibiting Collado from paying various entities before Natixis has been paid in full, it is worded differently in the Agreement than it is in prior versions of the Credit Facility. This difference is unsurprising, as the January 26, 2010 Agreement expressly states that it reflects an amended version of the Credit Facility. (Pl. Ex. 19 at Ex. D, 1.) There is no evidence to suggest that Collado and Natixis "replaced" rather than "amended" this Covenant. Indeed, the October 1, 2008 Amendment introduced the Covenant as a new Section 11(i) to the Credit Facility. (Def. Ex. C at COLLADO_000205.) The November 28, 2008 Amendment modified the Covenant by appending a proviso that allowed Collado to pay Ryerson in connection with certain trade payables and employee expenses. (Pl. Ex. 10 at COLLADO_002269.) The January 26, 2010 Agreement, meanwhile, simply renumbers the Covenant as Section 11(k) and replaces that proviso with another that allows Collado to pay certain accounts payable due to Grupo. (Pl. Ex. 19 at Ex D, 13.) With the exception of the amended proviso, it reproduces verbatim the Covenant from the October 1, 2008 Amendment.

22

The final feature of the January 26, 2010 Agreement that RCJV characterizes as

significant is the "Restructuring Fee" of $218,008.08 that Collado was required to pay Natixis

upon execution of the agreement. (Pl. Ex. 19 at Ex. D, 7.) However, the prior amendments had

similar features: the October 1, 2008 Amendment required Collado to pay Natixis "an

Amendment Fee in the amount of $20,000," (Def. Ex. C at COLLADO_000206), and the

November 28, 2008 Amendment required an immediate principal payment of $3,000,000, (Pl.

Ex. 10 at COLLADO_002270).[12]

Finally, the Court notes that the November 28, 2008 Amendment explicitly stated that

Natixis "ha[d] agreed to permit a final extension of the [Credit Facility] in order to afford

[Collado] the opportunity to find a replacement lender for [Natixis]." (Pl. Ex. 10 at

COLLADO_002268.) The Amendment went on to say that "under no circumstances should the

terms of this letter amendment be construed as a willingness of [Natixis] to extend financing to

[Collado] beyond December 28, 2009." (Id.) One might therefore be tempted to interpret

subsequent financing as a successor credit facility. Yet, even before the January 26, 2010

Agreement, Natixis approved an amendment dated July 15, 2009, (see Pl. Ex. 19 at Ex. D, 1),

---

[12] In its Rule 56.1 statement, RCJV observes that an amendment dated April 27, 2012 (the "April 27, 2012 Amendment") refers to the January 26, 2010 Agreement as the "Facility Agreement." (Full 56.1 ¶ 130; Pl. Ex. 20 at 1.) Because RCJV does not explain the significance of this fact, the Court is under no obligation to speculate as to what RCJV's argument might have been had RCJV cited this fact in its legal memoranda. See, e.g., A.L. v. New York City Dep't of Educ., 812 F. Supp. 2d 492, 495 n.1 (S.D.N.Y. 2011) ("The Court has considered the legal arguments made in Plaintiff's legal memoranda, rather than in the 56.1 Statement."); Rodriguez v. Schneider, No. 95 Civ. 4083 (RPP) 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument*."). In any event, the fact that the April 27, 2012 Amendment refers to the January 26, 2010 Agreement as the "Facility Agreement" is entirely consistent with the notion that the Agreement restated the amended Credit Facility in one document for the sake of clarity.

which presumably extended financing under the Credit Facility beyond that date. Regardless, the November 28, 2008 Amendment did not set an immutable end date for the Credit Facility beyond which any extension of financing must be considered a successor credit facility. And, most significantly, the Note itself contemplates that Natixis may "voluntarily extend[] the maturity" of the Credit Facility without triggering the successor-credit-facility provision. (Def. Ex. A at Ex. A, 2.)[13]

In short, RCJV has pointed to nothing that would lead a rational juror to interpret the January 26, 2010 Agreement's provision that the document merely "amend[s] and restate[s] in its entirety the Original [Natixis Credit Facility] Agreement" to mean anything but that. (Pl. Ex. 19 at Ex. D, 1.) As there was no successor credit facility, the Subordination Provision survives.

## B.     The Event of Default Provision

In its reply brief, RCJV argues for the first time that it can recover from Collado even if the Subordination Provision does not permit Collado to pay.[14] RCJV relies on the Event of Default Provision immediately following the Subordination Provision, which provides:

---

[13] For similar reasons, the Court also rejects RCJV's claim that the parties merely intended for the Note to be "structurally" subordinated by virtue of the different maturity dates for the Note and the Credit Facility. Although the earlier maturity date of the Credit Facility as of November 28, 2008 provided Natixis with some measure of protection, this cannot obscure the fact that the Note contains an explicit subordination provision that both (1) acknowledges the possibility that Natixis might extend the maturity of the Credit Facility beyond the Note's due date and (2) restricts payment of the Note even after the Note becomes due. (Def. Ex. A at Ex. A, 2.)

[14] RCJV's opening brief spends nine pages discussing the subordination defense, (Pl. Mem. 8-16), but does not analyze the contractual provision that it describes in its reply brief as the "clear clincher which defeats the entirety of Defendants' arguments," (Pl. Reply 28). This Circuit strongly disfavors the introduction of new issues in reply papers. See, e.g., Rowley v. City of New York, No. 00 Civ. 1793 (DAB), 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005). While the Court need not consider RCJV's argument, see Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005), the Court nevertheless exercises its discretion to do so because (1)

24

> Each of the following shall constitute an event of default under this Note (each, an "Event of Default"):
>
> (a) [Collado] fails to pay the entire Principal Amount, together with all accrued and unpaid interest thereon, on the Due Date (*whether or not [Collado] is permitted to make such payment* under the terms of the immediately preceding paragraph [*i.e.*, the Subordination Provision]); . . . .
>
> If [an] Event of Default occurs and is continuing, then, upon written notice by [RCJV] to [Collado], the entire outstanding portion of the Principal Amount and all accrued and unpaid interest hereunder and all other unpaid amounts and obligations due by [Collado] hereunder shall become immediately due and payable without protest, demand, presentment, or further notice of any kind.

(Def. Ex. A at Ex. A, 2-3 (emphasis added).)  RCJV argues that this Event of Default Provision ensures that the Note is subordinated only until the Note's due date of April 15, 2011—after that date, the provision mandates that Collado pay RCJV regardless of any outstanding debts under the Natixis Credit Facility.  While the language of this provision is superficially helpful to RCJV, closer scrutiny reveals that RCJV's reliance is unavailing.

The Court does not adopt Defendants' argument that the interpretation advanced by RCJV renders superfluous conditions (ii) and (iii) in the Subordination Provision.  The Subordination Provision allows Collado to pay RCJV if three conditions are met.  Condition (i) is that "no such payment may be made until such time as the Subordinated Debt becomes due and owing."  (Def. Ex. A at Ex. A, 2.)  The inclusion of two additional prerequisites to payment demonstrates that the Note may remain subordinated beyond the time that it becomes due and owing.  (Id.)  But the Note lists seven Events of Default upon which the Note becomes due and owing, including insolvency, bankruptcy, and the entry of a money judgment against Collado in

---

RCJV quoted the provision in its opening brief, (Pl. Mem. 8), albeit without comment; (2) RCJV made a similar argument in its statement of material facts, (Full 56.1 ¶¶ 135, 139), albeit in a manner inconsistent with Local Rule 56.1; and (3) Defendants provided a thorough response in their reply brief.

excess of $2,000,000.[15]  (Id. at Ex. A, 2-3.)  Even if Collado were unconditionally required to pay RCJV on April 15, 2011, conditions (ii) and (iii) in the Subordination Provision could still limit Collado's ability to pay RCJV if one of the *other* six Events of Default occurred before that date.

Nevertheless, the language of the Note belies RCJV's reading of the Event of Default Provision. The Note provides that "notwithstanding anything to the contrary herein"—with the exception of the sentence imposing three conditions on Collado's ability to pay RCJV—the Note is "subordinated in right of payment to all obligations of [Collado] to Natixis" under the Natixis Credit Facility. (Id. at Ex. A, 2.) The phrase "notwithstanding anything to the contrary herein" contains no exception for the Event of Default Provision. Thus, the Subordination Provision "overrides any inconsistent language elsewhere in the [Note]," including the Event of Default Provision. Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 90-91 (2d Cir. 2002); see also Rio Sportswear, Inc. v. Partners in Progress, No. 93 Civ. 0721 (JFK), 1993 WL 97317, at *3 (S.D.N.Y. Mar. 30, 1993). The Event of Default Provision nevertheless serves a meaningful purpose in this contractual scheme, as it lists a number of circumstances under which the entire debt becomes due and owing.[16]  In such circumstances, condition (i) for payment of the subordinated debt is satisfied, and only conditions (ii) and (iii) may operate as a bar to payment.

---

[15] Thus, the Event of Default Provision operates as an acceleration clause with respect to the other six Events of Default.  But it is not an acceleration clause for the Event of Default at issue here, for the obvious reason that if Collado fails to pay RCJV by the date on which the entire debt is due, it is too late to "accelerate" the due date.

[16] The provision does state that the entire debt becomes "due and *payable*" if any one of the seven Events of Default occurs. (Def. Ex. A at Ex. A, 3 (emphasis added).)  The Court does not, however, find that the parties chose the word "payable" rather than "owing" with the intention of

26

To be sure, the Note specifies that Collado's failure to pay on the due date is an Event of Default "*whether or not* [Collado] is permitted to make such payment under the terms of the [Subordination Provision]." (Def. Ex. A at Ex. A, 2 (emphasis added).) Thus, there is no question that Collado has defaulted on the Note. This does not, however, change the fact that RCJV may be "subordinated in right of payment" to Natixis "notwithstanding anything to the contrary" in the Event of Default Provision. (Id.) Nor does it change the fact that RCJV may not yet be "permitted to retain" any payment of the subordinated debt. (Id.)

Thus, as a matter of law, the Subordination Provision trumps the Event of Default Provision and is not rendered inapplicable by the January 26, 2010 Agreement. There is, however, a genuine dispute of material fact as to whether the Parenthetical Exception covers the October 1, 2008 Covenant and, therefore, as to whether a breach of that Covenant prevents payment of the Note. For these reasons, the Court denies both parties' motions for summary judgment on Collado's liability under the Note.

## C.    The Guaranty

RCJV is, however, in a position to collect from Coryer. The Guaranty provides that Coryer "irrevocably and unconditionally guaranties the full and complete payment and performance of all of [Collado's] obligations under this Note, *as and when due*." (Def. Ex. A at Ex. A, 5. (emphasis added).)

---

completely eviscerating a subordination provision that spans twenty-six lines of text. See LaSalle Bank Nat. Ass'n, 424 F.3d at 206.

Here, the Event of Default Provision is dispositive.[17]  Collado's failure to pay RCJV by April 15, 2011 is an Event of Default "*whether or not* [Collado] is permitted to make such payment under the terms of the [Subordination Provision.]"  (Id. at Ex. A, 2 (emphasis added).) If an "Event of Default occurs and is continuing, then, upon written notice by [RCJV] to [Collado]," the entire debt "due by [Collado] hereunder shall become immediately due and payable."  (Id. at Ex. A, 3.)  Indeed, Defendants concede that "the Promissory Note has reached maturity and is now due and owing."  (Def. Mem. 8; see also Def. Reply 5.)

Defendants argue that "collection cannot be made from Coryer until Collado is required to pay under the terms of the Subordination Clause."  (Def. Mem. 12.)  Thus, they contend, if summary judgment may not be entered against Collado, it may not be entered against Coryer either.  The plain language of the Guaranty, however, provides otherwise.  Indeed, Defendants repeatedly emphasize the distinction between, on one hand, the conditions under which Collado's debt to RCJV is "due" and, on the other, the conditions under which Collado is "permitted" to pay RCJV.  (Def. Mem. 8; see also Def. Reply 5.)  Coryer's obligation to pay is contingent on the former, not the latter.

---

[17] It is unclear whether RCJV can be said to have raised this argument in its opening brief.  (See Pl. Mem. 8 (quoting the Event of Default Provision and arguing that Coryer has failed to perform its obligations, but also suggesting that payment under the Guaranty is required only "[a]bsent valid subordination of the Note").)  Regardless, RCJV made this argument in its Rule 56.1 statement, (Full 56.1 ¶ 142-46), and articulated it clearly in its reply brief, (Pl. Reply 16), to which Defendants had ample opportunity to respond in their own reply brief.  Consequently, to the extent that the Court has discretion to disregard the argument, the Court declines to exercise it.  See Ruggiero, 424 F.3d at 252.  Indeed, Defendants should have been aware of the apparent inconsistency in their positions.  (Compare Def. Mem. 8 ("[T]he Promissory Note has reached maturity and is now due and owing.") with id. at 12 ("The language of the Guaranty . . . prevents any collection by RCJV from Coryer until Collado's obligations under the Promissory Note become due.").)

28

The two cases that Defendants cite are not to the contrary. In both, the subordination clauses at issue expressly covered the debts of both the borrower and the guarantor. See SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009) ("Section 2.4(a) of the Subordination Agreement provides: Until the Senior Creditor Repayment, no Junior Creditor shall be entitled to exercise any rights or remedies with respect to . . . any Guarantor or any Junior Creditor Guaranty . . . ." (first alteration in original)); Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank, N .A., No. 08 Civ. 5723 (NRB), 2009 WL 1834596, at *4 (S.D.N.Y. June 16, 2009) ("[T]he Intercreditor Agreement expressly provides that 'all rights, remedies, terms and covenants' contained in the 'Mezzanine Loan Documents'—a defined term that includes the mezzanine loan guaranty—are subordinate to the senior loan."). New York case law makes clear that subordination clauses may shield a borrower from liability while leaving a guarantor unprotected. See, e.g., Gard Entm't, Inc. v. Country in New York, LLC, 948 N.Y.S.2d 42, 43 (1st Dep't 2012); Standard Brands, Inc. v. Straile, 260 N.Y.S.2d 913, 917-18 (1st Dep't 1965). In sum, the language of the contract controls, and here it unambiguously requires Coryer to fulfill its guarantor obligations to RCJV.

## CONCLUSION

For the foregoing reasons, (1) the parties' cross-motions for summary judgment are denied as to Collado, (2) RCJV's motion for summary judgment is granted as to Coryer, and (3) Defendants' motion for summary judgment is denied as to Coryer.

The parties shall appear for a pretrial conference on May 23, 2014 at 11:30 a.m. in Courtroom 1506 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

The Clerk of Court is respectfully requested to close the motions pending at docket numbers 55, 79, and 83.

SO ORDERED.

Dated:     May 8, 2014
           New York, New York

Ronnie Abrams
United States District Judge

30